Case number 16-7107, Gary E. Johnson and L. Appellants v. Commission on Presidential Debate and L. Mr. Fine for the Appellants, Mr. Loss for the Appellees. May it please the Court, my name is Bruce Fine and I'm representing the Appellants, including Gary Johnson and Jill Stein, who were presidential candidates in 2012. With me is my partner, Bruce McFarland, who is also a member of the Bar of Biscuits. Thank you. Your Honor, this case comes procedurally in the context of a motion to dismiss under Rule 12b-1 and 12b-6, where all the factual allegations in the complaint must be accepted as true. And those factual allegations, which are buttressed by Exhibit 1 to the complaint, are that in 2012, the nominees of the Democratic and Republican parties, Mitt Romney and Barack Obama, in conjunction with the Commission on Presidential Debate, which is a joint venture of the Republican National Committee and the Democratic National Committee, would agree that the nominees of the two major parties would debate only under the auspices of the Commission on Presidential Debate, meaning, for example, they wouldn't agree to debate if the League of Women Voters wanted to host them, that they would boycott any joint appearances in any format with any other candidate, and that they would agree on what is commonly called in the briefs a 15 percent polling threshold as a condition for an invitation to participate in the debates, in addition to a requirement that a participant have qualified on sufficient state ballots to have a mathematical chance of winning an electoral college majority. And as the record shows, if they had stuck with simply the electoral college threshold, there would have been four rather than two participants in the debates. Counsel, I would like to pursue some of the standing issues in this case. There are three requirements for qualification for the debate. One was a constitutional problem, that is to say, you had to meet a certain age. Two, you had to qualify on enough states to be possible as an election, and three, 15 percent. Why wouldn't somebody be able to challenge the second requirement, the requirement that you be on enough state ballots to qualify as president? It may well be that they might have standing to do that. They would have standing to do that. Not necessarily because Velvey Hood teaches that if you've just concocted a very frivolous claim, there's a fine line between a 12B6 and a 12B1 motion. Perhaps. But if they would have had standing on that, why wouldn't any human, any citizen of the United States have standing just as your clients? Well, not everyone runs for president of the United States. They don't have to. They don't have to do that. Well, they have to show some kind of injury. Well, they would show that if I could get into the debates, then I would run. Or I would just announce beforehand, and once I get into the debate, boy, then I would get all the votes. Well, maybe. And I think what the Scrapp case teaches is that you could dismiss that on summary judgment in the Scrapp case, and that's how you would handle this. It's a frivolous complaint. You move for summary judgment. There's no facial plausibility to those particular allegations that that, in fact, was what happened. It's the same injury, is it not? So, therefore, any American who wanted to be in the debates and couldn't get into the debates would have the same injury? Not necessarily for purposes of subject matter jurisdiction. If you go back to Bell v. Hood, Justice Black says that if the 12B6 claim is so frivolous and you've just concocted it just to get into court, you can dismiss it for lack of subject matter jurisdiction. No, I would concoct it just to get into the debate. No, but I'm saying that the claim on the merits is so tenuous that you could dismiss it for lack of subject matter jurisdiction if it's clear there's very little substance that you've, in fact, suffered an injury that would satisfy a successful attack on the reasonableness standard of that particular qualification. I see your response, Matt. What about – what relief are you seeking? Here, Your Honor, we're seeking damages and possibly, if we prevailed on the merits, seeking some possible dissolution of the Commission on Presidential Debates because we argue it's a monopoly. That's an injunction you're asking for. That would be an injunction down the road if that was appropriate relief. With respect, are you – did you explicitly ask for an injunction? In the complaint? Yes, Your Honor. All right. Now, that would depend on future – underlines that it would depend on future plans to get into a debate? Well, no. The theory would be, Your Honor, that this is in essential facilities and that because they're so conflicted that dissolving the – what we consider the monopoly – But underlines, wouldn't you have to show that you're planning to go into the debates the next time? You would have to have some showing of that certain – Did you have any such statement in your complaint? Your Honor, at that particular time, there weren't any debates scheduled, so we don't know whether there'll be debates in 2020. It's not like it's part of the official government calendar. It's up to the CPD to decide to schedule debates. But the relief you're seeking has to be something in the future, right? Correct, Your Honor. So, therefore, you have to underline, show that you have an intention. You haven't alleged that. Yes, that is correct. We can't get an injunction for the future unless there's some concrete possibility that we would be having a debate. We confront this particular issue. How can we say we have an intent to participate, say, in the 2020 debates? They aren't even scheduled yet. They may not occur at all. How can you have an intent to participate in something that hasn't even been scheduled? Did you just undermine your own request for an injunction? The question is, is your relief too speculative? I think that's a concern. That particular form of relief may be too speculative. I mean, our major effort to get relief is to have an examination on the merits of the reasonableness of the 15 percent threshold. We think we have monetary damages. That's what happened in 2020. There's nothing speculative about that. And if we go to the argument that you were presenting, Judge Silverman, which is a very sound one, well, what about standing? One of the arguments made by the district court was that we didn't have standing because our preexisting flaw was that we didn't satisfy the 15 percent threshold. And therefore, there was no injury. Well, true enough. But then to that theory, nobody would ever have standing because they would say the reason why you have an injury is you didn't satisfy the threshold that you claim is illegal. You correctly point out that that conflates the merits with the standing issue. Yes, Your Honor. And then there are other elements that come into play with regard to, you know, why there's no standing. What about antitrust standing? The antitrust standing. Now, that deals only with the antitrust issue. No, the Article III standing issue. Yes. There's a separate antitrust. No, no, no. I'm putting aside Article III for a moment. Okay. I'm looking at antitrust standing. Okay. The antitrust standing is we argue that the injury to competition as opposed to the injury to the competitors, because we understand that's what you have to allege, is that what is the market out here where you're running for president? You're distributing information about presidential candidates. That's what candidates do. This is what I'm going to do. This is what my opponent is going to do. And that information market was diminished. Competition was hurt there because you arbitrarily excluded with the purpose of destroying the ability of rival candidates who had satisfied a credible public support standard of having their information distributed. So it's an output limitation. Excuse me. If the market is a political market, you lose, right? We argue that. Yeah, that's correct. If it's a political market, you lose. If it has no commercial impact, because if you look at Ally Tube and the Superior Court Trial Lawyers Association, they suggest there are oftentimes situations where there's a convergence of commercial and political markets, if you will. Just because it has a political impact doesn't mean it has a commercial element. And let's look at the Serial Court. Okay. But that doesn't quite get you there, does it? When you're talking about lawyers boycotting, I mean, there's a market of lawyers getting paid for their services. The market is relatively well defined. And here your brief defines the market as the multi-billion dollar business of campaigning for the presidency. Who is buying what? And at which the price for what is getting affected? Whose price? Well, I think if you give me your Arendelle just a second here, with regard to the Superior Court case, there what was being done by the lawyers was to get the government to raise the price. It wasn't bribery. It wasn't saying the government in quid pro quo, the government will negotiate a deal with the trial lawyers. They got the government to act. That was political action. But it had a commercial element to it. It's like arguing the government should raise the minimum wage. It's political action. But it has a commercial element to it, just as it did in Superior Court. And to your specific question, Judge Pillard, what is the market? The market, the recipients of the presidential information, what do they get? Well, they can make contributions. They can donate time. They can otherwise speak on behalf of a particular candidate. It's not wholly dissimilar to asking, you know, what does a student get in a university? They get exposure to ideas, right? So what do they do with the ideas? Well, you know, they pay tuition. It costs them to get into the university. But they get educated. They have access to information. They can use it in a whole host of ways that they may choose to do so. So they're buying a product which is an education and a degree that comes with it. Who is buying what here? Well, no one is. If you notice that in our brief, we cite a known large campaign contributor, Betsy DeVos. She's now the secretary of education. And the DeVoses gave large sums of money to candidates. And they interviewed her and said, well, what are you getting? What's in it? What are you getting for your donations? She says, well, we're getting the policies that we want. We expect. And she used the term. That's our return on investment. Now, it's certainly true, Your Honor, that if it was just bribery, if they said, hey, here's the money. You know, we're selling you our presidential information. Give us money in exchange and we'll use it. Then you run into FEC issues and whether you can make contributions or things like that. But we don't think that it's disqualified from a market that has commercial objectives and goals simply because the recipients, the immediate recipients of the information aren't engaged in a transaction that we call commerce. But sometimes it is. Donald Trump has. The candidates sell, merchandise. It's a commercial transaction. Donald Trump made billions of dollars. But that's not the objective of your suit. What is the commercial objective and goal? It's that a candidate can spend a year being paid by a committee that is a key is a sum of the public donations. And it's like that that candidate can have a gap year on the on the. No, I think let's take the analogy to the Superior Court case. Now, what was the goal in Superior Court that the court characterized as commercial? The goal was to get the government to enact a law that would heighten the compensation for criminal justice attorney appointees for services. Goals of presidential candidates all the time have similar goals. We want to increase the minimum wage. We want to decrease taxes. We want to open up oil pipelines that have commercial objectives. Under Superior Court, those are commercial goals. And the way you execute them is getting government to act. And what Superior Court teaches is that if the goal, even if it requires the government to act, has a commercial element to it, the means by which you get to the goal, that is the means by which you are able to get into office or pressure the government, then is subject to the antitrust law. And that's the gist of what our argument is here. The means by which you're deciding or involved in campaigning for the president, including the special presidential debates, becomes subject to the antitrust laws. And I want to underscore, Your Honor, that at this particular stage, there has been no examination of whether or not the 15% threshold is reasonable, unreasonable. You have never got there. You said you're out no matter whether the threshold could be 60% or 55%. I see I've overstepped my time. I wanted to reserve three minutes. I don't know whether I can come back with your indulgence, Judge Brown, to respond. We will decide how much rebuttal time you get. Okay, thank you. Good morning. Good morning. I'm Lou Loss. I'm counsel for the Commission on Presidential Debates, Frank Fahrenkopf and Mike McCurry. I'm speaking today on behalf of my clients, as well as the other appellees, Barack Obama, Mitt Romney, the Republican National Committee and the Democratic National Committee. With me today at council table is my colleague, Uzo Manukwanda. I think that the legal defects and significant legal principles that preclude this suit from going forward are particularly clear, well addressed by the district court, and we certainly had ample opportunity in our briefing to review them. So I think in addition to responding to any questions that the court has, I'd like to focus in on two points. The first is the one that the court expressed some interest in in its questioning and that Mr. Fine was just addressing. It seems to us extremely clear that this is a political lawsuit. The actions that are being challenged are core political decisions that are also quintessential speech. How do you distinguish a trial lawyer's case? In a trial lawyer's case, it was a commercial boycott of providing services that had as a goal inducing some political action to provide higher wages for those folks. But those lawyers were engaged in a commercial boycott. The decisions that are being challenged here... programs include a range of economic questions. Like Ben Wade and so forth. I think it's in the Knorr case where the Supreme Court addressed this and it would undercut democracy if folks couldn't come together in common cause to try to persuade their government to adopt a particular policy. It would infringe the First Amendment for the government to interfere with that kind of political speech. And the case law is very clear that in order to fall within the ambit of the antitrust laws, the conduct that's at issue has to be commercial conduct. All of the commercial aspects of campaigning for the presidency that are collected very well by appellants are incidental. Those aren't the decisions that are at issue here. In other words, your distinction between the trial lawyer's case and this case is the trial lawyer's case, the overwhelming objective is economic.  Absolutely. In this case, the overwhelming objective is political. It has some ancillary economic aspects. That's your point? Exactly. Thank you, Your Honor. Now, what about the Article 3 question? Well, I think there's a significant standing problem here. As the district court found in Filani and this court found in Filani on appeal. Let's assume every American citizen has the same injury. Do they still have standing then? That isn't a generalized grievance, is it, because it's not abstract? Well, I think there are multiple problems from a standing perspective. The first is I don't think every citizen or these appellants have a cognizable legal injury under the McConnell case. Their fundamental grievance is that they were not able to compete on what they would call a level playing field. Well, no, wait a minute. You would be better off saying everybody had the same thing. Now I'm really puzzled. Wouldn't you be better off saying everybody had the same thing and then argue it's a generalized grievance? Except if everybody has it, nobody does. Right. I was going through all three elements. I do think it would be a generalized grievance, and if everybody has it, that shows the absurdity of permitting this case to go forward. Your hypo also highlights that these appellants have not argued they would have won the presidency. They're not going to try to show, if this case were to go forward, that but for their exclusion from the case. Well, they're not going to do that because that makes it strictly a political case, and then they're out. Right, but my point is going to be that their injury was the same. You're saying that every candidate, every citizen would be able to argue. The other 200 people certainly who would want to run for president would be in the same position. Exactly. I think maybe everybody is in the same position because if I wanted to be in the debates, I would have made a lot of money. Well, we'd be happy to consider your candidacy, Your Honor. Is there an age limit for the president? I don't think you're too young, Your Honor. It would seem that the appellants here have a much more focused claim, though. They're saying you have to look for standing at what they're challenging, and therefore were they to succeed on the merits, what would they gain, not what someone else with a broader claim and a lower threshold would get. That seems to me that's what distinguishes this case from Felani. It's one thing to say, well, if the nonprofit status of the debate sponsoring organization were removed, then maybe and maybe and maybe, whereas here they're saying all we're after is get rid of that 15% threshold, and there's only a very small group of candidates who would additionally be part of the debates were that to happen. And the likelihood seems quite high, in contrast to Felani, that the debates would go on with the slightly larger field. And so that's, I think, their case on what reduces the speculativeness, and what's your response to that? There are several. If you look at footnote 8 of our brief, we list some of the candidates in the last 20 or 30 years who have achieved ballot access sufficient to have a theoretical electoral college majority. I think you'll see when you review that list of names that there are a number of names that it's really hard to imagine that the major party candidates would have agreed to share the stage with candidates who enjoyed such modest public support. Further, and let me just say as a policy matter, the CPD has spent countless hours on these candidate selection criteria, trying to figure out the best way to do it. And we have worked hard at exactly this approach. What if you just went with the standard that these appellants want? The problem is, while gaining ballot access in enough states to have a theoretical electoral college majority is no small accomplishment. A, it says nothing about public interest in the actual candidate. It's an organizational and financing undertaking. B, if you made that the ticket into the televised general election debates, many more candidates would actually go out and accomplish that. It would be completely unworkable. You might not win, I mean, they might not win on the merits, but for purposes of standing, it seems like even the handful in footnote 8, and they do point to precedence with Perot being in and Anderson being in, I mean, there's going to be some coverage. Let me address the Anderson example because I think it's instructive and it actually shows how speculative it is to think that they would get the relief that they seek from a standing perspective. In 1980, the League of Women Voters sponsored the debates and used the same 15% standard that is challenged here. At the time of the first presidential debate, John Anderson satisfied it. He was invited to participate in the debates. President Carter refused to participate in that debate. This is a matter of public record. So there was a debate just between Governor Reagan and John Anderson. Later, after the debate, also somewhat contrary to what opponents would have you think happens if you participate in a debate, John Anderson's support fell dramatically. He did not qualify for participation in the next debate. So it is highly speculative to think that even at 15% that they necessarily would result in a... There's some questioning at 15%. Isn't that the one with the merits not standing? Well, I think the history shows us that it's speculative to think that a major party candidate would agree to participate. Well, wait a minute. If I understand their case, it is not the likelihood of winning an election that is their damage. It's the economic consequences of being kept out of the debate. The economic consequences which would flow from selling hats and things like that. But it all hinges on them being in the debate with the leading candidates. Right. That doesn't have to do with their chances of winning the election, does it? Agreed. Totally agreed. It seems to me that someone who has, say, 30% on the polls, but has not qualified in enough states to be elected president would still have the same injury. I think that's a helpful question. Right. That is true. Because if I had 30%, I would say, look, I may not be qualified in enough states, but boy, would I cause a lot of trouble and would I be able to sell a lot of hats if I had 30%. So I want to challenge the reasonableness of the other standing. And it seems to me you would have standing... A person in that position would have standing. They would lose, perhaps, on the merits, which is a separate question. I mean, I'm just reading the cases and thinking about there's no question raised about standing in Arkansas Educational TV v. Forbes, in Johnson v. FEC. Even if you think about the St. Patrick's Day parade case, Hurley, nobody said, oh, you don't have standing because if you join the parade, we might not have a parade. You know, you could make that argument, but it seemed that the criterion that was being challenged was directly the hurdle to keeping, you know, that kept that party out. And we have a similar kind of structure here. So I just, you know, I wonder if you could square with this because they're so breezy. There are just so many cases where we have a similar structure. I think I can. You might note that we haven't moved to have the case dismissed as to the First Amendment claim on standing grounds. And the cases to which you refer were constitutional cases, First Amendment cases. And our understanding of the case law, and certainly Johnson v. FCC bears this out, is that were there a violation of the First Amendment, that creates its own cognizable injury. What about redressability? Now, here's what I find a little puzzling. If an order were issued to allow the plaintiffs to be in the next debate or damages for not having been in the last debate, there is a question whether this would encroach upon the First Amendment rights of Romney and Obama. Is that a redressability issue for standing? You understand my question? In other words, if it is determined that an order directing the new debate or the old debate to include the plaintiffs would interfere with the First Amendment rights of Romney and Obama, which you could argue. Does that go to redressability for standing on the First Amendment? I think it does. Would you like that argument? Well, it doesn't matter, because if it's a standing issue, we raise it on our own. And it's true as to the Commissioner of Presidential Debates as well. We have First Amendment rights, as the Court recognized in Perot, and it would encroach upon the CPD's First Amendment rights. Is that a merits issue, or is that a standing question, because it reflects on the redressability of the Court? I wasn't sure of the answer to that. I think it is sometimes difficult to sort out when it is a merits question and when it is a standing question. No, I knew it was difficult. I expect to know from you. I will tell you this. When the law is as clear as this law is with respect to the First Amendment rights of the appellees, I think it is appropriate to address it as a standing question and not solely as a merits issue. I'll ask the other side on that. The final point that I wanted to make is this. Mr. Fine said in his presentation that the relief they actually seek in response to Judge Silberman's questioning is they just want the reasonableness of these criteria to be reviewed. They don't get to jump over all these important legal principles under the First Amendment and the antitrust laws to get that reviewed. Now, that doesn't mean there is nowhere they can go. In fact, the Federal Election Commission regulates the sponsorship of Presidential Debates and other debates for federal office. They have regulations governing candidate selection criteria. There is a procedure for any person aggrieved to file a complaint with the Federal Election Commission and then to obtain judicial review if they wish at the conclusion of the FEC's process. In fact, the Libertarian Party and the Green Party have filed such a complaint. The FEC has addressed it once. It went up to the District Court. It was remanded. The Federal Election Commission just recently addressed it again. It includes a reasonableness review of the 15% criteria and if they wish, the parties in that case can seek further judicial review. There is an avenue open for them and important legal principles need not be bent beyond their breaking point to accommodate the desire for some review. Thank you very much. Thank you, counsel. Mr. Feinhead, no time left. We'll give you two minutes. Thank you, Your Honor. I appreciate it. Just to respond to the last remarks by my opponent here, it seems to me inconsistent to say on the one hand, the First Amendment protects absolutely the right of the CPD and Obama and Romney to decide the debate format. And then on the other hand, saying, but the FEC, acting under statute, can challenge and penetrate the First Amendment right. The Constitution trumps the statute, whether it's an antitrust law or an FEC law. What about the concern, suppose we conclude that President Obama and Governor Romney had a First Amendment right to debate as they wished without excluding others. And does that go to the redressability, which is one element of standing? I think it goes to the merits, Your Honor, but I want to point out. Why doesn't it go to redressability? Because the question is, if they don't. Even if we concluded that you might have a First Amendment claim. If we conclude that Romney and Obama have a First Amendment claim not to debate by themselves, then aren't we faced with a redressability question for you? Therefore, a standing question for you. Well, yes, but it merges into the merits, Your Honor, because you have to decide the First Amendment issue on the merits. It does. It does with puzzling, but that's why I'm puzzled. And I think, Your Honor, the Associated Press case addresses your question, you know, thoroughly. In Associated Press, the argument was made by forcing Associated Press to permit members to come in, have access, and to present APUs. That was strictly a commercial case. No. If you look at Justice Black's opinion, and we reproduced it in our brief, he doesn't ever mention the word commercial there. He says it's First Amendment values that are at stake in deciding that they're not going to accept that authority of AP to say, you can kick everybody else out because you're involved, in his words, news and views, like news and ideas. And he says that's the reason why you have no First Amendment right to say you don't want to deal and sell your AP news to anybody but your members and you can automatically veto anyone else. In his passage, he never even hints at commerce being the touchstone of his decision. With regard to the statement that was made that the Commission is involved in trying to elicit what public interest there would be in the participants, the fact is they don't use a public interest standard to calculate the 15%. As we point out in our brief, in the year 2000, almost two-thirds to three-quarters of the members of the public said they wanted Ralph Nader and Pat Buchanan in the debates. Nowhere. In 1996, after Ross Perot got 19% of the vote, in 1992, after he participated in debates and rose from 7% to 19%, the two major party nominees said, you're out. You can't come in, even though he had 19%. So the standard isn't just voter interest. We allege the standard is what can strengthen the dominance of the two major parties and make certain that there's as little encroachment as possible on the major party nominees in running for the president. And I think, Your Honor, you're also correct in noting that our grievance isn't purely – it's not we didn't win the election. Also, you know that even if you just capture substantial support, you can have an influence on those economic issues that you addressed that are part of every campaign. For example, Ross Perot, he didn't win in 1992, but he injected balanced budgets. And those who are around here during the Clinton administration, he made balanced budget a cornerstone of his agenda, and he touted it as a major accomplishment. And that was there because Ross Perot was permitted to participate in those issues. But I appreciate, Your Honor, for the extra time, and thank you. Thank you, Mr. Fine. The case will be submitted.
judges: Brown, Pillard, Silberman